*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

AGNES N. CRAMER,

        Plaintiff-Appellant,

v

TRANSITIONAL HEALTH SERVICES OF
WAYNE and AMERICAN ZURICH INSURANCE
COMPANY,

        Defendants-Appellees.

FOR PUBLICATION
August 26, 2021
9:25 a.m.

No. 347806
MCAC
LC No. 14-000086

Before: SHAPIRO, P.J., and JANSEN and BECKERING, JJ.

JANSEN, J.

Plaintiff appeals as on leave granted the opinion and order of the Michigan Compensation Appellate Commission (MCAC) affirming in part and reversing in part the order of the Workers' Compensation Board of Magistrates. The MCAC reversed the magistrates order denying disability benefits to plaintiff predicated on a shoulder injury, but affimed, in pertinent part, the magistrate's determination that plaintiff failed to demonstrate that her mental health issues were significantly contributed to by plaintiff's workplace accident.

Plaintiff previously filed an application for leave to appeal in this Court. See *Cramer v Transitional Health Services of Wayne*, unpublished order of the Court of Appeals, entered August 16, 2019 (Docket No. 347806), where this Court ordered:

Pursuant to MCR 7.205(E)(2), in lieu of granting the application for leave to appeal, the Court REMANDS this matter to the Board of Magistrates for the limited purpose of allowing the magistrate to determine whether plaintiff is entitled to a discretionary award of attorney fees on unpaid medical benefits. MCL 418.315(1); *Harvlie v Jack Post Corp*, 280 Mich App 439, 444-446; 760 NW2d 277 (2008). The conclusion of the Commission that the magistrate exercised her discretion to deny a requested award is unsupported by the record where the magistrate's opinion makes no reference to attorney fees. The Court does not retain jurisdiction. In all

-1-

other regards, the application for leave to appeal is DENIED for lack of merit in the grounds presented.

Plaintiff filed an application for leave to appeal that order in our Supreme Court, which in turn ordered:

> On order of the Court, the application for leave to appeal the August 16, 2019 order of the Court of Appeals is considered and, pursuant to MCR 7.305(H)(1), in lieu of granting leave to appeal, we REMAND this case to the Court of Appeals for consideration, as on leave granted, of whether: (1) the Michigan Compensation Appellate Commission correctly concluded that the magistrate properly applied the four-factor test in *Martin v Pontiac Sch Dist*, 2001 Mich ACO 118, lv den 466 Mich 873 (2002), and the standard in *Yost v Detroit Board of Education*, 2000 Mich ACO 347, lv den 465 Mich 907 (2001); (2) the *Martin* test is at odds with the principle that a preexisting condition is not a bar to eligibility for workers' compensation benefits and conflicts with the plain meaning of MCL 418.301(2); and (3) the Michigan Compensation Appellate Commission correctly concluded that the magistrate's lack of causation conclusion was supported by the requisite competent, substantial, and material evidence utilizing the proper standard of law. In all other respects, leave to appeal is DENIED, because we are not persuaded that the remaining question presented should be reviewed by this Court. [*Cramer v Transitional Health Services of Wayne*, 505 Mich 1022; 941 NW2d 370 (2020).]

We now affirm.

## I. BACKGROUND

On February 8, 2012, plaintiff was working at defendant Transitional Health Services as a dietary manager at a nursing home. She wiped a light fixture with a wet rag, received an electric shock, fell off a ladder, and hit her shoulder and head. She was taken to a hospital, assessed, and, showing no indications of injury, released. Plaintiff began experiencing seizures at the end of March 2012. It was later determined that these were non-epileptic seizures, meaning that they were brought on not by any physical brain abnormality but by stress. Plaintiff was diagnosed with PTSD, and she also claimed to be experiencing severe headaches. It is not disputed that plaintiff had an extremely traumatic history, including 19 years of horrific abuse at the hands of her ex-husband. The defense posture was that plaintiff's mental issues stemmed primarily from this history and that plaintiff was also exaggerating her claims of disability.

Testimony was presented from the following providers who treated plaintiff: Manfred Greffenstein, Ph.D., a licensed psychologist; Dr. Wilbur J. Boike, M.D., a neurologist; John Stokes, a vocational rehabilitation consultant; Dr. Mariana V. Spanaki-Varalas, M.D., who monitored plaintiff in an epilepsy-monitoring unit; Andrea J. Thomas, a psychologist; Dr. Gregory Barkley, M.D., who along with Thomas, worked with treating a small group of women, including plaintiff, who had a history of traumatic experiences; and James Fuller, a certified rehabilitation counselor.

Greiffenstein met with plaintiff and conducted a neuropsychological evaluation of plaintiff. Greiffenstein spoke with plaintiff, and reviewed several imaging scans. Specifically, Greiffenstein reviewed an MRI of plaintiff's brain that was normal, and an EEG that showed no epileptiform activity. Greiffenstein concluded that on the basis of plaintiff's medical history, her apparent symptoms "waxed and waned in dramatic fashion," with diagnoses added and dropped accordingly. Plaintiff was having "psychogenic non-epileptic seizures" (PNES). Greiffenstein stated that PNES "are usually caused by the intersection of an underlying personality disorder and unusually stressful circumstances." He said that the causes could be in the distant past or "in the here and now." He added, "[T]he theory is that [PNES] act to control the environment in persons who otherwise have inadequate coping skills." PNES are "a complex behavior triggered by stress that mimics seizures." Plaintiff had been in a physically and sexually abusive marriage, was still in contact with her ex-husband, was estranged from some of her children, and maintained a contentious relationship with her mother. Accordingly, Greiffenstein found that "the stressors in [plaintiff's] life are not at one time or at [sic] one off event. They are recurrent features of her daily existence."

Greiffenstein reported that plaintiff "used exaggerated language to describe the symptoms and their functional impact on her life." After administering several tests, Greiffenstein concluded that plaintiff's results were consistent with someone "grossly overstating" disability-related complaints. He noted that plaintiff "did not make the types of errors associated with focal or diffuse brain disease" and stated that, "[b]ased on negative brain scans and a chart history of waxing and waning complaints, the evidence favors histrionic personality" or "Undifferentiated Somatoform Disorder" (USD). He said, "This is a form of mental illness characterized by prolific but medically unexplained symptoms, where personality and situational factors are the root cause." Greiffenstein stated that it is difficult to distinguish this illness from "malingering," or faking, and that this difficulty was present in plaintiff's case, because she had presented elements of such faking. Greiffenstein also gave a diagnosis of "conversion disorder." When asked to define this, he stated:

> Conversion disorder is the modern term for what used to be called chronic hysteria, meaning a psychologically disturbed patient whose mental illness takes the form of medically unexplained symptoms. In the case of conversion disorder, the medically unexplained symptoms refer to the central nervous system, meaning they might mimic disorders of the central nervous system but on further medical testing there is no lesion of the central nervous system found. These are typically persons who are histrionic and give colorful and dramatic medical histories that ultimately don't add up or make sense.

Greiffenstein concluded that plaintiff was able to work. He stated, "Mental health services are presently indicated for interpersonal conflict. These are personal problems that pre-date the accident." Greiffenstein said that plaintiff's "symptom claims are best understood as an interaction between a disturbed personality and psychosocial stressor." This personality issue would have been present before plaintiff even began working at Transitional Health Services.

Dr. Boike also conducted an independent neurological examination of plaintiff. In his first report, Dr. Boike concluded that plaintiff's "neurological examination is absolutely normal." Indeed, plaintiff had had normal EEG findings even when claiming that seizures had occurred. He

agreed with the diagnosis of "pseudoseizures" and said that plaintiff "demonstrates no apparent cognitive difficulties to suggest that she has any significant cognitive problems at this time." Dr. Boike did recommend that plaintiff be seen for psychiatric treatment to determine if she had psychiatric difficulties as a result of the work incident.

In his second report, Dr. Boike indicated that plaintiff was now complaining of frequent migraine headaches and associated slurred speech and reported to him that the severe headaches began in October 2013. Dr. Boike opined that plaintiff "appears to have largely substituted one diagnosis for another." He stated:

> It remains my strong opinion that [plaintiff] has no neurological impairment or disability. So long as her subjective complaints provoke yet evermore evaluation and treatment by medical care providers, it is likely that [plaintiff's] complaints will escalate over time. Given her complaints regarding comments reportedly made to her concerning the possibility of future "Parkinson's" disease, I would not be at all surprised if this will be the next "presentation" of her "illness."
>
> I strongly recommend that medical care providers discontinue the current practice of reacting to every new symptom as a manifestation of some serious underlying illness. I actually believe [plaintiff's] long-term prognosis is excellent. I believe it is likely that she will completely resolve all of her current "difficulties"[] once there is resolution of whatever legal proceedings are underway at this time. I do not believe [plaintiff] requires any additional evaluation or treatment of her ongoing complaints.
>
> I strongly doubt that she is actually experiencing headaches at this time

Dr. Boike concluded that plaintiff could work.

Stokes testified that he met with plaintiff in June of 2014. On the basis of the opinions of doctors who said that plaintiff could work, Stokes looked for jobs for which plaintiff would be qualified. He noted that plaintiff had actually completed a final course for her Bachelor's degree in May 2013, after the workplace incident. Stokes identified jobs, such as receptionist, accounting clerk, bookkeeper, and fast-food-service manager, that plaintiff could perform. Apparently, plaintiff had been offered a job as a food-court manager that paid $120,000 a year, but the offer was rescinded when she mentioned her seizures. Stokes opined that plaintiff was exhibiting "work avoidance" by bringing up the seizures to prospective employers. He opined that, in light of certain medical opinions and her job skills, plaintiff had not "sustained the loss of her wage earning capacity."

Dr. Spanaki-Varalas testified that she saw plaintiff on May 16, 2012, and formulated a treatment plan for her. Dr. Spanaki-Varalas admitted plaintiff into an epilepsy-monitoring unit at the end of June 2012 where plaintiff remained for 14 days. Dr. Spanaki-Varalas stated that with medication and without medication, "We didn't see any brainwaves that are specific and indicate epilepsy." Plaintiff did not have a "100 percent normal EEG" because there were "some slow waves," but these were not "specific or diagnostic," and the doctor could not opine about what caused them. Dr. Spanaki-Varalas concluded that plaintiff's accident at work "led to anxiety" and

that she therefore "developed [PTSD]." The doctor testified, "The patient had none of those episodes before the insult, and then she progressively developed those up to the point that she had convulsive episodes." Dr. Spanaki-Varalas stated that the workplace incident "was the starting point of [plaintiff's] symptoms" and was a significant factor that led to PTSD and related non-epileptic seizures (NES). Dr. Spanaki-Varalas admitted that she was not in the best position to determine the "cause or etiology of what ultimately was [the] diagnosis of PTSD leading to" NES and that this was best left to other professionals.

Thomas, who began seeing plaintiff in October 2012, testified that the difference between NES and epileptic seizures is that epileptic seizures begin in the brain and NES are triggered by stress. Plaintiff told Thomas that her first seizure was on March 28, 2012. Thomas stated that plaintiff had moderate depression, PTSD, and conversion disorder with NES. She explained conversion disorder as a disorder whereby "the body converts . . . stress into a physical symptom." Thomas did not think that plaintiff was malingering. Thomas stated that she determined that plaintiff had NES because they were "diagnosed during her stay in the [epilepsy] unit," and she determined that plaintiff had PTSD on the basis of "t[aking] [plaintiff's] history." Thomas said that plaintiff had stressors earlier in her life, but the workplace incident made "the situation that much worse" and contributed to or caused her NES and PTSD. Thomas did not think that plaintiff was employable at the moment because of her NES and the PTSD symptoms. Plaintiff was taking clonazepam for anxiety and Lamictal to stabilize her moods.

Similarly, Dr. Barkley testified that he did not think plaintiff was a malingerer and that she was trying to get better. Dr. Barkley said that plaintiff had a number of physical and psychological symptoms, such as headaches, that did not exist before the workplace incident, and that, therefore, the incident was causally related to them. Dr. Barkley admitted that plaintiff did not present to him with severe headache symptoms until August 19, 2013, although she complained of other headaches before then. In connection with her complaint of a severe headache, plaintiff reported having had an emotionally stressful week seeing her children. Dr. Barkley opined that plaintiff was disabled because of severe PTSD and NES. He was hopeful that she could rejoin the workforce in one or two years. Dr. Barkley stated that plaintiff had been able to cope with "the other things that had happened to her," but the workplace incident "became the straw that broke the camel's back." He admitted that he was relying on plaintiff's provided information in making his conclusions.

Finally, Fuller testified that he met with plaintiff at the request of plaintiff's counsel and found her unemployable. He stated that there was an "either/or conundrum" in this case, because some professionals had concluded that plaintiff was able to work and some had concluded that she was not able to work. His opinion was formed from records provided by plaintiff's counsel, i.e., records indicating that plaintiff could not work. In addition, plaintiff reported to Fuller that she suffered from migraine headaches and NES and that she was lying down for 70 percent of waking hours. According to Fuller, plaintiff told him she turned down the $120,000-a-year job because she "felt incapable of performing the work."

Plaintiff also offered testimony. Regarding the February 8, 2012, work incident, plaintiff recalled that she was thrown off the ladder and then hit her head on a sink and on the floor. She claimed that hospital records from that day that omitted a history of head injury were wrong, because she mentioned a head injury and head problems, and not just an arm injury, when taken

to the hospital. She claimed that she lost consciousness, but said, "When I hit my head the second time I came to." She acknowledged that the summary of the hospital visit stated that "the patient has escaped from any major injury or trauma to herself" and "will be going home." She also admitted that her various tests were normal.

Plaintiff claimed that in March 2012, she began experiencing tremors and was dizzy and had headaches. She claimed that she did not have any NES during her stay in the hospital epilepsy unit because "it was a very calm environment." When asked what stressors in her life precipitated the seizures, she mentioned the trial and the denial of workers' compensation benefits. She said that she had gotten black eyes and broken ribs and had experienced incontinence as a result of her seizures. Plaintiff claimed that she was experiencing migraines with "stroke-like symptoms" and that they had been getting worse. She stated, "[T]here's something with the protons and ions that collide in my brain that pushes my brain out to my cranium." She claimed to have problems reading because of "blurriness."

Plaintiff stated that her emotional state and tearfulness were getting worse and that she did not want to live. She admitted that she attempted to commit suicide on July 4, 2014, and "died three times" from overdosing on pills. When asked about what she worked on with Thomas, plaintiff mentioned her "previous family issues." Plaintiff testified, "[W]hat happens when you have a severe trauma in your life, there are things that come flooding back into your head. And it's hard for you to push them away because it's like a dam being burst."

The magistrate issued a 42-page opinion. She stated that *Martin v Pontiac Sch Dist*, 2001 Mich ACO 118, provided a four-factor test for determining whether a workplace incident was a significant element in a plaintiff's allegedly disabling condition.[1] She said that "the factors to be considered are 1) the number of occupational and non-occupational contributors, 2) the relative amount of contribution of each contributor, 3) the duration of each contributor, and 4) the extent of permanent effect that resulted from each contributor." She stated that the test "compares qualitatively the occupational contributors to the non-occupational contributors." The magistrate detailed plaintiff's history of trauma and the testimony that plaintiff's PTSD and conversion disorder were influenced by the workplace incident. The magistrate stated that nonoccupational contributors were plaintiff's repetitive abuse in her prior marriage, the loss of her relationship with her mother, the loss of her relationship with some of her children, and her loss of her church community. The magistrate described the occupational contributor as "the electric shock and fall

---

[1] MCL 418.301(2) states:

> Mental disabilities and conditions of the aging process, including but not limited to heart and cardiovascular conditions and degenerative arthritis, are compensable if contributed to or aggravated or accelerated by the employment in a significant manner. Mental disabilities are compensable if arising out of actual events of employment, not unfounded perceptions thereof, and if the employee's perception of the actual events is reasonably grounded in fact or reality.

from the ladder." She stated that the nonoccupational triggers outnumbered the occupational triggers.

With regard to the second *Martin* factor, the magistrate merely stated that Thomas, Dr. Barkley, and Dr. Spanaki-Varalas did not quantify the effect of plaintiff's earlier stressors and the workplace incident but merely said that the incident caused the PTSD and conversion disorder. Concerning the third *Martin* factor, the magistrate stated that plaintiff's nonoccupational stressors are "continuing," that plaintiff's mother had "disowned" her, that plaintiff's own children did not believe that she was having seizures from a work injury, and that plaintiff attempted suicide in July 2014 "when her children chose to spend the holiday with their grandmother rather than with her." The magistrate said that the work incident "was a one-time incident with no ongoing objective residuals." As for the fourth *Martin* factor, the magistrate concluded that "there is no objective evidence that there are permanent effects from" the workplace incident and no "objective medical evidence" of a closed head injury or seizures. She also mentioned that plaintiff's PTSD and NES might improve and added that "it appears plaintiff's nonoccupational stressors are long term and possibly permanent."

The magistrate noted the testimony that the workplace incident was " 'the straw that broke the camel's back,' " but stated that such a "straw" was insufficient to meet the necessary statutory standard for entitlement to benefits in connection with a mental illness. She explicitly rejected the causation testimony of Thomas, Dr. Barkley, and Dr. Spanaki-Varalas and stated that they did not "establish[] a hierarchy of plaintiff's nonoccupational stressors versus her occupational stressors" and merely "made the assumption that because plaintiff was working she was not having stress from the nonoccupational stressors." She said, "All of plaintiff's nonoccupational stressors were the more substantial contributors and clearly outweighed her occupational stressors."

The magistrate explicitly accepted the testimony of Greiffenstein and Dr. Boike. She said that plaintiff's "non-occupational stressors had advanced the [PTSD] and conversion disorder so close to disability that a significant contribution from the electric shock and fall was virtually impossible." The magistrate concluded that plaintiff did become disabled for a time because of a shoulder injury resulting from the workplace incident. However, she then denied benefits regardless, stating that plaintiff had failed to present evidence establishing that she made a good-faith effort to find employment during this period and, therefore, had failed to establish a limitation in her wage-earning capacity in work suitable to her qualifications and training.

Plaintiff filed claim for review with the MCAC. On January 25, 2019, the MCAC issued an opinion and order in which the commission clarified the magistrate's opinion, affirmed the opinion in part, and reversed the opinion in part. The commission overturned the magistrate's determination that plaintiff was not entitled to full wage-loss benefits as a result of her shoulder injury. In so doing, the MCAC rejected the magistrate's finding that plaintiff presented no evidence that she made a good-faith effort to find employment during her period of disability resulting from the shoulder injury. The commission found that plaintiff was entitled to full wage-loss benefits for the period from February 8, 2012, to April 12, 2013.

The MCAC rejected, however, plaintiff's claim that the magistrate incorrectly "lumped together" plaintiff's emotional difficulties with physical neurological problems and, thereafter,

employed an incorrect standard to assess whether those combined problems were related to the workplace accident. The commission elaborated:

> Plaintiff argues that, separate from her emotional difficulties, she also has organic neurologic problems that are not properly analyzed under MCL 418.301(2) but should be analyzed under the lower standard of causation found in MCL 418.301(1). We disagree. . . .

> We affirm the magistrate's conclusion that plaintiff does not have organic neurologic problems as that conclusion is supported by competent, material, and substantial evidence.

As for plaintiff's "non-organic" (or non-physically-based) mental issues, the commission rejected plaintiff's challenges to the application of *Martin*. The MCAC stated:

> The magistrate found that plaintiff has emotional problems. She writes, "Every treating or expert neurophysiology, neurologist, neuropsychologist, psychiatric [sic], or examiner agreed plaintiff has emotional problems. The area of disagreement is causation and whether plaintiff's psychiatric problems prevent her from returning to employment . . ." Thereafter, the magistrate uses the language in MCL 418.301(2) and the four-factor test outlined in *Martin* . . . to analyze whether plaintiff's emotional/mental problems were significantly contributed to by occupational events and circumstances. This analysis by the magistrate was proper considering the finding that plaintiff had emotional problems. MCL 418.301(2), *Martin*, supra [sic]. The analysis resulted in the magistrate finding the occupational incident on February 8, 2012, did not significantly contribute to the plaintiff's emotional difficulties. Consequently, the magistrate concluded that plaintiff failed to meet her burden of proof to establish that the emotional problems (mental disability) were work related.

> \* \* \*

> Plaintiff argues that *Martin* . . . does not faithfully implement the standards constructed by the Legislature in MCL 418.301(2). We disagree. *Martin* is an en banc decision of this Commission that provides, contrary to plaintiff's assertion, a framework for consistent analysis of whether work factors played a significant causative role in a worker's mental disability.

> Plaintiff next argues that the magistrate erred in the application of the four-factor test in *Martin* to the facts of this case. We disagree.

> Analysis of the four factors in *Martin* is fact finding and if supported by competent, material, and substantial evidence the analysis must be affirmed. This magistrate separately analyzed each of the four factors in light of the evidence. Thereafter the magistrate concluded that the work incident was not a significant contributor to the acknowledged mental conditions. The number, duration, and impact/effect of plaintiff's non-work stressors outweighed those aspects of the stress associated with the work event. Additionally, the magistrate rejected the

-8-

opinions of Ms. Thomas, Dr. Barkley and Dr. Spanaki-Varalas, and relied upon the testimony of Dr. Boike and Dr. Greiffenstein. Plaintiff, once again, provides a detailed argument that there is evidence that supports another conclusion. As previously noted we are not permitted to alter a magistrate[']s conclusion simply because there is evidence supporting that altered conclusion. . . . The lack of causation conclusion reached by the magistrate is supported by the requisite competent, material, and substantial evidence and therefore must be affirmed. Plaintiff's argument to the contrary fails.

As noted, plaintiff sought leave to appeal in this Court, but this Court denied the application. *Cramer*, unpub order. Plaintiff sought leave to appeal in the Supreme Court, which remanded this matter back to this Court for consideration of the three questions noted *supra*.

## II. STANDARD OF REVIEW

This Court exercises de novo review of questions of law involved in any final order of the MCAC. *Mudel v Great Atlantic & Pacific Tea Co*, 462 Mich 691, 697 n 3; 614 NW2d 607 (2000). "A decision of the MCAC is subject to reversal if it is predicated on erroneous legal reasoning or the wrong legal framework." *Ross v Modern Mirror & Glass Co*, 268 Mich App 558, 561; 710 NW2d 59 (2005). "The judiciary reviews the [MCAC's] decision, not the magistrate's decision." *Mudel*, 462 Mich at 732. "The judiciary treats the [MCAC's] findings of fact, made within the [MCAC's] powers, as conclusive absent fraud. If there is *any* evidence supporting the [MCAC's] factual findings, the judiciary must treat those findings as conclusive." *Id*.

## III. ANALYSIS

We first answer our Supreme Court's directive to determine whether "the Michigan Compensation Appellate Commission correctly concluded that the magistrate's lack of causation conclusion was supported by the requisite competent, substantial, and material evidence utilizing the proper standard of law." *Cramer*, 505 Mich 1022. As stated in *Mudel*, 462 Mich at 732:

The [MCAC] treats the magistrate's findings of fact as conclusive if supported by competent, material, and substantial evidence on the whole record.

[S]ubstantial evidence means such evidence, considering the whole record, as a reasonable mind will accept as adequate to justify the conclusion.

The whole record means the entire record of the hearing including all of the evidence in favor and all the evidence against a certain determination.

The [MCAC's] review shall include both a qualitative and quantitative analysis of that evidence in order to ensure a full, thorough, and fair review.

The [MCAC] has authority to make independent findings of fact, and is not required to remand a case to the magistrate where factual findings necessary to the decision are lacking, as long as the record is sufficient for administrative appellate review and the [MCAC] is not forced to speculate. [Quotation marks and citations omitted; see also MCL 418.861a.]

We conclude that the MCAC employed a proper standard of law when analyzing the magistrate's decision regarding causation. Indeed, the MCAC set forth the proper standards toward the beginning of its opinion. It noted that although it had some fact-finding powers, it could not simply substitute its judgment for that of the magistrate if competent, material, and substantial evidence supported the magistrate's findings. See *id*. at 699-700.

MCL 418.301 states, in part:

(1) An employee, who receives a personal injury arising out of and in the course of employment by an employer who is subject to this act at the time of the injury, shall be paid compensation as provided in this act. A personal injury under this act is compensable if work causes, contributes to, or aggravates pathology in a manner so as to create a pathology that is medically distinguishable from any pathology that existed prior to the injury. In the case of death resulting from the personal injury to the employee, compensation shall be paid to the employee's dependents as provided in this act. Time of injury or date of injury as used in this act in the case of a disease or in the case of an injury not attributable to a single event is the last day of work in the employment in which the employee was last subjected to the conditions that resulted in the employee's disability or death.

(2) Mental disabilities and conditions of the aging process, including but not limited to heart and cardiovascular conditions and degenerative arthritis, are compensable if contributed to or aggravated or accelerated by the employment in a significant manner. Mental disabilities are compensable if arising out of actual events of employment, not unfounded perceptions thereof, and if the employee's perception of the actual events is reasonably grounded in fact or reality.

On appeal, plaintiff no longer argues about a physical or "organic" condition, but focuses on her mental problems; she accedes that subsection MCL 418.301(2) is the applicable paragraph. As noted, "findings of fact made by a worker's compensation magistrate shall be considered conclusive by the commission if supported by competent, material, and substantial evidence on the whole record." MCL 418.861a(3). MCL 418.861a(3) also states that " 'substantial evidence' means such evidence, considering the whole record, as a reasonable mind will accept as adequate to justify the conclusion." There was no allegation of fundamentally incompetent or immaterial evidence in the present case, and plaintiff agrees that the question for the MCAC was whether the evidence was such that a reasonable mind would accept it as adequate to justify the causation conclusion reached by the magistrate.

Plaintiff contends that no reasonable mind could accept that the workplace incident did not contribute to or aggravate plaintiff's mental illness in a significant manner. She contends that Dr. Boike's causation testimony should not be credited because he stated that he would defer to a mental health professional for a resolution of that question and because he worked primarily with spinal conditions. Plaintiff also contends that Greiffenstein's opinion on causation could not be accepted by a reasonable mind because he was focusing on whether a traumatic brain injury occurred, because he wrongly focused on whether the workplace incident was life-threatening, because the shock *was* in fact life-threatening, and because he simply (and wrongly) assumed that the shock was minor.

-10-

We conclude that plaintiff's arguments are not persuasive. Although Dr. Boike stated that he mostly saw spinal patients, he also stated that he "never quit being a general neurologist." And while he agreed that plaintiff needed a psychiatric consult to explore psychiatric issues, he also stated that plaintiff claimed to experience only one day a week without headaches, but had also reported that her seizures had improved to the point that she was only having "one episode every two to three weeks" as opposed to 14 in one month. As a result, Dr. Boike opined that plaintiff "appears to have largely substituted one diagnosis for another." He stated:

So long as [plaintiff's] subjective complaints provoke yet evermore evaluation and treatment by medical care providers, it is likely that [plaintiff's] complaints will escalate over time. Given her complaints regarding comments reportedly made to her concerning the possibility of future "Parkinson's" disease, I would not be at all surprised if this will be the next "presentation" of her "illness."

I strongly recommend that medical care providers discontinue the current practice of reacting to every new symptom as a manifestation of some serious underlying illness. I actually believe [plaintiff's] long-term prognosis is excellent. I believe it is likely that she will completely resolve all of her current "difficulties"[] once there is resolution of whatever legal proceedings are underway at this time. I do not believe [plaintiff] requires any additional evaluation or treatment of her ongoing complaints.

I strongly doubt that she is actually experiencing headaches at this time.

Dr. Boike stated, "When [plaintiff] was told, frankly, that these events that she represented as seizures were not really seizures, they seemed to have largely gone away." He also thought that plaintiff was consciously controlling her intermittent slurred speech. He did not believe the headaches, if they were real, had anything to do with the work incident. He questioned plaintiff's diagnosis of conversion disorder because he suspected malingering. He thought that once the potential secondary gain from legal proceedings was eliminated, plaintiff would improve. Dr. Boike concluded that plaintiff could work.

As for Greiffenstein, he stated that the "core" of what he did in the present case was to evaluate whether plaintiff had residual effects from a traumatic brain injury, but the whole of his testimony, as delineated in the statement of facts, reveals that he also evaluated many other aspects of plaintiff's case, such as, for example, her failed relationships. As for plaintiff's complaint that Greiffenstein characterized the shock she incurred as minor, Greiffenstein, in doing so, referred to the "earliest description of the injury facts" - and plaintiff herself acknowledged that the summary of the hospital visit from the day of the incident stated that "the patient has escaped from any major injury or trauma to herself" and "will be going home." It is not disputed that Greiffenstein had access to plaintiff's medical records. The gist of his testimony was that this shock was an insignificant factor when compared globally to plaintiff's situation; this was not improper in light of available records.

Greiffenstein reported that plaintiff "used exaggerated language to describe the symptoms and their functional impact on her life." After administering several tests, Greiffenstein concluded that plaintiff's results were consistent with someone "grossly overstating" disability-related

-11-

complaints. He testified that, based on a comparison to other cases, "[t]here was no doubt that [plaintiff] is engaging in extreme over-report of symptoms and problems." He stated, "[S]he's a person who puts a lot of energy into looking as neurologically, and memory, and medically, and psychologically impaired as she possibly can." He went on to opine, "Mental health services are presently indicated for interpersonal conflict. These are personal problems that pre-date the accident."

Greiffenstein testified that plaintiff's "symptom claims are best understood as an interaction between a disturbed personality and psychosocial stressor." This personality issue would have been present before plaintiff even began working at the nursing home. He was asked if the work incident played a role "in any of the various impressions that you g[a]ve in this case." He replied, "Well, it's certainly a factor in her mind. You know, this work incident has become the convenient focus for everything that's wrong in her life and relationships." Greiffenstein stated that he did not believe that plaintiff had a psychological disability and that she "puts a lot of energy into having her many symptoms believed." He said, "Ultimately, it's her underlying personality that creates problems for her."

The MCAC explicitly noted that the magistrate relied on the testimony of Greiffenstein and Dr. Boike and found that the magistrate's causation conclusion was supported by "the requisite competent, material and substantial evidence." Plaintiff's arguments go to the weight to be afforded the testimony of Greiffenstein and Dr. Boike, but their testimony certainly had *some* weight in favor of defendants' position. There was evidence in support of the MCAC's decision, *Mudel*, 462 Mich at 732, and no indication that the MCAC somehow misapplied the governing legal standards.

Next, we consider whether "the Michigan Compensation Appellate Commission correctly concluded that the magistrate properly applied the four-factor test in *Martin v Pontiac Sch Dist*, 2001 Mich ACO 118, lv den 466 Mich 873 (2002), and the standard in *Yost v Detroit Board of Education*, 2000 Mich ACO 347, lv den 465 Mich 907 (2001)[.]" *Cramer*, 505 Mich 1022.

In *Martin v City of Pontiac Sch Dist*, 2001 Mich ACO 118 at 16, the commission, in an en banc decision, adopted a four-factor guide for determining whether a claimant's employment contributed to his or her mental disability in a significant manner. The four factors identified in *Martin* are "1) the number of occupational and non-occupational contributors, 2) the relative amount of contribution of each contributor, 3) the duration of each contributor, and 4) the extent of permanent effect that resulted from each contributor." *Id*. The *Martin* panel rejected the use of the so-called "last event" or "straw that broke the camel's back" analysis. *Id*. It stated, "As the analogy indicates, otherwise harmless events can precipitate drastic consequences when accompanied by more substantial circumstances. As we have explained, the law requires plaintiffs to prove significance independent from the nonoccupational events." *Id*.

In *Yost v Detroit Bd of Ed*, 2000 Mich ACO 347 at 6, the commission, evaluating a knee injury, stated:

> As already noted, structural change of the knee resulting from an injury does not ipso facto render the injury a significant contribution to the resulting condition. Evidence of structural change or a mere shift form [sic] asymptomatic status to

symptomatic status is never enough, standing alone, to demonstrate significant contribution, because a pre-existing condition might be so severe that a minor, insignificant workplace event pushes the employee over the edge into a symptomatic condition, providing merely the "last straw breaking the camel's back."

The Supreme Court has asked this Court to determine if the MCAC correctly concluded that the magistrate properly applied *Martin* and *Yost*. As noted, the MCAC stated the following with regard to *Martin*:

> Analysis of the four factors in *Martin* is fact finding and if supported by competent, material, and substantial evidence the analysis must be affirmed. This magistrate separately analyzed each of the four factors in light of the evidence. Thereafter the magistrate concluded that the work incident was not a significant contributor to the acknowledged mental conditions. The number, duration, and impact/effect of plaintiff's non-work stressors outweighed those aspects of the stress associated with the work event. Additionally, the magistrate rejected the opinions of Ms. Thomas, Dr. Barkley and Dr. Spanaki-Varalas, and relied upon the testimony of Dr. Boike and Dr. Greiffenstein. Plaintiff, once again, provides a detailed argument that there is evidence that supports another conclusion. As previously noted we are not permitted to alter a magistrate[']s conclusion simply because there is evidence supporting that altered conclusion. . . . The lack of causation conclusion reached by the magistrate is supported by the requisite competent, material, and substantial evidence and therefore must be affirmed. Plaintiff's argument to the contrary fails.

Plaintiff contends that the MCAC's decision was insufficient because the MCAC did not engage in a discussion of the nonoccupational stressors as compared to the occupational stressors. This argument is not persuasive because the above excerpt from the MCAC's opinion, read as a whole, makes clear that the commission was accepting—because of their basis in competent, material, and substantial evidence—the conclusions of the magistrate with regard to the factors. Plaintiff also contends that the MCAC's decision was deficient because the MCAC failed to assess the magistrate's rejection of the testimony by Thomas, Dr. Barkley, and Dr. Spanaki-Varalas. But once again, the above excerpt makes clear that the MCAC was accepting—because of its basis in competent, material, and substantial evidence—the decision of the magistrate to reject plaintiff's causation evidence and accept defendants'. The MCAC set forth the competing evidence in its opinion, and implicit in its ruling was that Greiffenstein and Dr. Boike provided competent, material, and substantial evidence for the magistrate's causation decision. Plaintiff appears to be arguing that there is some sort of facial deficiency in the MCAC's opinion, but the opinion is detailed enough for appellate review.

Plaintiff cites *Lombardi v William Beaumont Hosp*, 199 Mich App 428; 502 NW2d 736 (1993). In *Lombardi*, *id*. at 435-436, this Court stated:

> We are troubled, however, by the WCAB's rather conclusory determination that plaintiff's employment contributed to, aggravated, or accelerated his mental disability in a significant manner.

-13-

* * *

In this case, the controlling and concurring opinions of the WCAB contain no mention of the various non-occupational factors that might have contributed to plaintiff's disability, much less an analysis of the relative effect of occupational and nonoccupational factors on plaintiff's mental condition. Indeed, the controlling opinion contains but a single fleeting reference to the "significant standard," and the concurring opinion offers little more than a conclusory finding of significant contribution, aggravation, or acceleration in the form of the statutory language. Such conclusory treatment of the significant manner issue is insufficient to facilitate meaningful judicial review. Therefore, we remand this case to the WCAB for a determination whether plaintiff's employment was a significant contributing, aggravating, or accelerating factor in the overall scheme of his mental disability, taking into consideration both nonoccupational and occupational factors.

In that case, "[t]he hearing referee denied benefits, finding that plaintiff's disability was not caused by work-related conditions. Plaintiff appealed to the WCAB, which reversed the decision of the hearing referee . . . ." *Id*. at 432. The present case is different because the magistrate gave a very detailed analysis of the various factors in issue, and it is clear from the MCAC's opinion that it was *accepting* this analysis.

As for the application of the *Martin* and *Yost*[2] factors, the magistrate set forth plaintiff's history of trauma and the testimony that plaintiff's PTSD and conversion disorder were influenced by the workplace incident. The magistrate said that nonoccupational contributors were plaintiff's repetitive abuse in her prior marriage, the loss of her relationship with her mother, the loss of her relationship with some of her children, and the loss of her church community. The magistrate described the occupational contributor as "the electric shock and fall from the ladder," and that the nonoccupational triggers outnumbered the occupational triggers. Concerning the second *Martin* factor, the magistrate stated that Thomas, Dr. Barkley, and Dr. Spanaki-Varalas did not quantify the effect of plaintiff's earlier stressors and the workplace incident but merely said that the incident caused the PTSD and conversion disorder. With regard to the third *Martin* factor, the magistrate said that plaintiff's nonoccupational stressors are "continuing," that plaintiff's mother had "disowned" her, that plaintiff's own children did not believe that she was having seizures from a work injury, and that plaintiff attempted suicide in July 2014 "when her children chose to spend the holiday with their grandmother rather than with her." The magistrate said that the work incident "was a one-time incident with no ongoing objective residuals." As for the fourth *Martin* factor, the magistrate said that "there is no objective evidence that there are permanent effects

---

[2] Plaintiff complains that the MCAC failed to mention the *Yost* test. However, the magistrate incorporated *Yost's* straw-that-broke-the-camel's-back test into its discussion of *Martin*. In *Martin*, 2001 Mich ACO 118 at 16, the commission spoke of this "last-event" issue, and the MCAC in the present case concluded that the magistrate "correctly applied" the "standards" from *Martin.* Plaintiff's apparent complaint of a facial deficiency in the MCAC's opinion in connection with *Yost* is not persuasive. The concept expressed in *Yost* was adequately ruled upon by the MCAC.

from" the workplace incident and no "objective medical evidence" of a closed head injury or seizures. The magistrate stated that "it appears plaintiff's nonoccupational stressors are long term and possibly permanent." The magistrate noted the testimony that the workplace incident was " 'the straw that broke the camel's back,' " but that such a "straw" was insufficient to meet the statutory standard. Ultimately, the magistrate found that, "All of plaintiff's nonoccupational stressors were the more substantial contributors and clearly outweighed her occupational stressors."

On the basis of the foregoing, as well as the record before this Court, we conclude that the MCAC did not err by concluding that the magistrate's conclusions regarding the *Martin* and *Yost* factors were supported by competent, material, and substantial evidence. When asked about what she worked on with Thomas, plaintiff mentioned her "previous family issues." She said, "[W]hat happens when you have a severe trauma in your life, there are things that come flooding back into your head. And it's hard for you to push them away because it's like a dam being burst." Plaintiff described the abuse in her first marriage as lasting the entire marriage and as being mostly mental and sexual abuse, although her ex-husband had pulled her hair and thrown her against walls. She stated that the ex-husband also physically abused the couple's children. Plaintiff stated that her mother told her "that whatever happens in the bedroom between a man and a woman is not rape no matter what" and told plaintiff to "put up with it." Plaintiff would try to go back to live with her mother to escape the abuse, but her mother would "force[] [plaintiff] to go back." Plaintiff's mother blamed plaintiff for getting a divorce, and their relationship suffered. Plaintiff had no other family to rely on, and her ex-husband ended up getting custody of three of the couple's children. Plaintiff said that the entire situation "did not sit well with [her] for a long time."

Plaintiff admitted that she attempted to commit suicide on July 4, 2014. She said that she was in a bad place that day because she had had a migraine the night prior, because her "kids couldn't come home for the holiday," and because the "fireworks were like lightening [sic]." Later, she admitted that two of the children had chosen to spend the weekend with plaintiff's mother and did not answer plaintiff's telephone calls. Plaintiff felt "lonely and isolated" as a result.

Greiffenstein stated that "the stressors in [plaintiff's] life are not at one time or at [sic] one off event. These are recurrent features of her daily existence." He opined that plaintiff had "repeated psychological trauma" from "coping with failed relationships." He stated, "Mental health services are presently indicated for interpersonal conflict. These are personal problems that pre-date the accident." Similarly, Dr. Spanaki-Varalas testified that the workplace incident "brought up or maximized [plaintiff's] previous stressors" and caused plaintiff to stop being able to "cop[e]." Moreover, Thomas testified that NES can result from a singular incident or from physical or sexual abuse that occurred in the distant past. She said that physical or sexual abuse was "probably the most common" risk factor. When asked about the relevance of plaintiff's history, Thomas said, "Things can happen over time, then there will be that one straw that breaks the camel's back and initiates stronger symptoms." Thomas thought plaintiff's workplace incident "tipped the balance" and caused the seizures to start occurring. Dr. Barkley also stated that plaintiff had been able to cope with "the other things that had happened to her," but the workplace incident "became the straw that broke the camel's back." Implicit in this phrasing is a recognition that the workplace incident was not a "major" event but was a "straw" that tipped the balance against plaintiff.

-15-

In light of all this testimony, the MCAC's acceptance of the magistrate's analysis of the various factors was proper. There was testimony about the workplace incident being "the straw that broke the camel's back," testimony about multiple nonoccupational stressors that started long in the past and continued to this day (as evidenced, in part, by plaintiff's distress over her children), and testimony that these stressors had fundamentally impacted plaintiff and become a fixture of her daily life. In *Martin*, 2001 Mich ACO 118 at 16, the commission noted that a doctor had "fail[ed] to establish a hierarchy of contributors." The magistrate in this case also noted that such a hierarchy was not definitively established, but still, the ultimate conclusion that the occupational stressors were not significant had adequate support in the evidence. Certainly the "any evidence" test has been met. *Mudel*, 462 Mich at 732 (italics removed).

The magistrate's statement that "[a]ll of plaintiff's nonoccupational stressors were the more substantial contributors and clearly outweighed her occupational stressors" was, arguably, an improper legal analysis, because the purpose of the *Martin* test is not to determine which contributors—nonoccupational or occupational—come out "on top." As stated in *Martin*, 2001 Mich ACO 118 at 12, " '[S]ignificant' does not require a preponderance standard where work contributors in combination with any natural progression of the condition accelerate the condition more than the non-work contributors." The question, as set forth in MCL 418.301(2), is whether occupational factors contributed to the mental condition "in a significant manner." However, the magistrate went on to state that "a significant contribution from the electric shock and fall was virtually impossible." The imperfect wording of the magistrate's opinion was not consequential. Importantly, as will be discussed *infra*, the *Martin* factors are only a guide for determining whether the significant-manner standard has been satisfied, and the MCAC's decision to uphold the magistrate's ultimate conclusion that the significant-manner standard had not been satisfied had adequate support in the evidence. While the evidence produced could *also* have led to the contrary conclusion, it is not the role of this Court to overturn a decision supported by the evidence in a workers' compensation case.

Finally, our Supreme Court directed this Court to determine whether "the *Martin* test is at odds with the principle that a preexisting condition is not a bar to eligibility for workers' compensation benefits and conflicts with the plain meaning of MCL 418.301(2)[.]" *Cramer*, 505 Mich 1022. We conclude that it is not.

Once again, MCL 418.301(2) states:

> Mental disabilities and conditions of the aging process, including but not limited to heart and cardiovascular conditions and degenerative arthritis, are compensable if contributed to or aggravated or accelerated by the employment in a significant manner. Mental disabilities are compensable if arising out of actual events of employment, not unfounded perceptions thereof, and if the employee's perception of the actual events is reasonably grounded in fact or reality.

And again, the four factors identified in *Martin* are "1) the number of occupational and non-occupational contributors, 2) the relative amount of contribution of each contributor, 3) the duration of each contributor, and 4) the extent of permanent effect that resulted from each contributor." *Martin*, 2001 Mich ACO 118 at 16.

-16-

In *Gardner v Van Buren Pub Schs*, 445 Mich 23, 48; 571 NW2d 1 (1994), overruled on other grounds by *Robertson v DaimlerChrysler Corp*, 465 Mich 732; 641 NW2d 567 (2002), our Supreme Court opined: "[I]t is well established that employers take employees as they find them, with all preexisting mental and physical frailties. A claimant's preexisting condition does not bar recovery." The Court also stated that "[t]he significant manner requirement now forces a claimant to actually prove a significant factual causal connection between the actual events of employment and the mental disability" and added that "[t]he significant manner requirement also imposes on claimants a higher standard of proof." *Gardner*, 445 Mich at 46-47. The Court concluded that "the causal connection must be objectively established given a particular claimant's preexisting mental frailties." *Id*. at 49. The Court stated:

> The relevant inquiry, and the only inquiry presently required by workers' compensation law in this state, is: Did the actual events of employment occur, and do these bear a significant relationship to the mental disabilities? Reduced to its simplest form, the analysis is this: Given actual events and a particular claimant, with all the claimant's preexisting mental frailties, can the actual events objectively be said to have contributed to, aggravated, or accelerated the claimant's mental disability in a significant manner?
>
> This type of inquiry places the focus where it should be: on the authenticity of the underlying event and the significance of its relationship to the resulting disability. [*Id*. at 50.]

The Court set forth the following guidance regarding the application of MCL 418.301(2):

> In determining whether specific events of employment contribute to, aggravate, or accelerate a mental disability in a significant manner, the factfinder must consider the totality of the occupational circumstances along with the totality of a claimant's mental health in general.
>
> The analysis must focus on whether actual events of employment affected the mental health of the claimant in a significant manner. *This analysis will, by necessity, require a comparison of nonemployment and employment factors. Once actual employment events have been shown to have occurred, the significance of those events to the particular claimant must be judged against all the circumstances to determine whether the resulting mental disability is compensable*. [*Id*. at 47 (emphasis added).]

In *Farrington v Total Petroleum Inc*, 442 Mich 201, 221-222; 501 NW2d 76 (1993), the Court stated that the "significant manner" requirement requires that "occupational factors . . . be considered together with the totality of [a] claimant's health circumstances to analyze whether the . . . injury was significantly caused by work-related events."

We cannot conclude that the *Martin* test conflicts with the plain language of MCL 418.301(2) when it essentially conforms with the Supreme Court's own guidance regarding how to apply that statute—i.e., it provides for a comparison of nonemployment and employment factors. Indeed, analyzing the number of stressors, the relative amount they contribute to a

condition, the various stressors' duration, and the extent of the stressors' permanent effect essentially implements the language from *Gardner* and *Farrington*. A worker with a preexisting illness can obtain benefits as long as an analysis of pertinent factors shows that a work stressor contributed to, aggravated, or accelerated the illness in a significant manner.

Plaintiff argues that the *Martin* test allows the trier of fact to presume the existence of a causal relationship between a non-employment factor and an employee's illness and that this is improper because the statutory language does not create any such presumption. Plaintiff spends considerable time in her brief contending that the MCAC cannot create a presumption not authorized by statute. However, the test does not authorize any such presumption. The test refers to "contributors," and clearly this term refers to *contributors to the disability at issue*. Anyone applying the test would, by necessity, have to first *determine* that a non-employment factor contributed to the disability in order to count it as a "contributor."

Plaintiff also argues that the test's directive to count contributors will almost always result in a finding of non-compensability because "(1) the amount of time an employee spends away from work will always exceed the amount of time spent working, and (2) the number of nonoccupational contributors will likely exceed the number of occupational contributors." We find this argument to be entirely speculative. A person with a particularly stressful job and a peaceful home life may well have many more contributors toward a mental condition at work than at home. Plaintiff argues that the assessment of duration is "likewise biased towards a finding of non-compensability because an employee has lived his or her life both before and after the work experience." Again, however, a person with a particularly stressful job and a peaceful home life may well have longer-lasting contributors toward a mental condition at work than those at home.

Plaintiff takes issue with this statement from *Martin*:

> Fourth, the magistrate must examine whether any permanent effect resulted from any contributor. Stated differently, the magistrate must evaluate the ability of medical treatment, including rest and abstaining from work, to reverse the effect of the contributor. In those instances where the contributors can be separated, the more lasting effect produces greater significance. [*Martin*, 2001 Mich ACO 118 at 13.]

Plaintiff contends that MCL 418.301(2) "lacks language authorizing the fact-finder to consider whether a contributor's causal relationship to disability can be decreased in any way." But, the commission tied its reference to the possibility of treatment to the concept of "significance," which is obviously a concept encompassed by the statute.

Finally, plaintiff argues that the *Martin* test transforms the statute's requirement to assess whether a condition was contributed to in "a significant manner" into a requirement to assess whether a condition was contributed to in "the most significant manner." However, the *Martin* panel explicitly stated:

> The essence of the process is as follows: as a basic principle, significant contribution requires more than minimal contribution. *However, "significant" does not require a preponderance standard where work contributors in*

*combination with any natural progression of the condition accelerate the condition more than the non-work contributors.* Between these two parameters, we require the occupational contributors to constitute a vital component or to contribute a considerable amount to the progression of the condition. [*Id*. at 12.]

In other words, the *Martin* panel recognized that the purpose of the test was not to determine whether work contributors were "the" most significant factors. The panel later reiterated that "[c]ontribution is significant when it constitutes a vital component or when it contributes a considerable amount toward the progression of the condition." *Id*. at 16. Recall the language from *Gardner*, 445 Mich at 47, that "[t]he analysis must focus on whether actual events of employment affected the mental health of the claimant in a significant manner. This analysis will, by necessity, require a comparison of nonemployment and employment factors." The *Martin* panel was attempting to undertake such a comparison. It is important to remember that "[c]ourts must give effect to every word, phrase, and clause in a statute and avoid an interpretation that would render any part of the statute surplusage or nugatory." *State Farm Fire & Cas Co v Old Republic Ins Co*, 466 Mich 142, 146; 644 NW2d 715 (2002). It is not enough that a workplace event contributes to a mental disability—it must have done so *in a significant manner*. The *Martin* panel was attempting to come up with a framework for implementing this language, in accordance with *Gardner*. In *Mudel*, 462 Mich 702 n 5, the Court stated:

> This distinction between the administrative and judicial standards of review flows from the long-recognized principle that administrative agencies possess expertise in particular areas of specialization. Because the judiciary has neither the expertise nor the resources to engage in a fact intensive review of the entire administrative record, that type of detailed review is generally delegated to the administrative body. In the particular context of worker's compensation cases, a highly technical area of law, the judiciary lacks the expertise necessary to reach well-grounded factual conclusions. Worker's compensation cases typically involve lengthy records replete with specialized medical testimony. These cases require application of extremely technical and interrelated statutory provisions that determine an employee's eligibility for disability benefits. The judiciary is not more qualified to reach well-grounded factual conclusions in this arena than the administrative specialists. Therefore, the Legislature has decided that factual determinations are properly made at the administrative level, as opposed to the judicial level.

In addition, while an agency cannot interpret a statute in a way that changes its meaning, an agency's interpretation of a statute it is charged with implementing is entitled to respectful consideration and should not be overturned without cogent reasons. *Grass Lake Imp Bd v Dep't of Environmental Quality*, 316 Mich App 356, 362-363, 366; 891 NW2d 884 (2016). The *Martin* panel was attempting to come up with a workable manner for applying the "significant manner" test in the course of agency fact-finding, and there does not appear to be cogent reasons for overturning the test it concluded would be appropriate. Of particular import is the *Martin* panel's statement that the "test" is not a definitive checklist. The panel stated:

> Importantly, we avoid creating a bright-line test or a checklist. Instead, we propose factors which concentrate the analysis on the fundamental evidence regarding

increased contribution. We prefer factors because factors differ from elements. Each element requires a preponderance of proof. Factors do not require such proof. Rather, overwhelming proofs regarding one factor can overcome the absence of proof regarding another factor. . . . The magistrate's evaluation defies mathematic calculation. It simply requires a conclusion, using specified criteria, that the evidence presented satisfies a legal standard. [*Martin*, 2001 Mich ACO 118 at 11-12.]

The panel stated, "We also accept the notion that fact-finding discretion must prevail over an absolute definition." *Id*. at 10. As stated in *Dortch v Yellow Transp, Inc*, 2007 Mich ACO 21 at 4:

We repeat our previous caution that the factors enumerated in *Martin* should act as merely guides, aiding the fact finder in their often difficult task of weighing the evidence before them, and not as a Bright-Line test. In the final analysis, we must keep in mind the Legislature placed the responsibility and power to determine what is significant in the hands of the magistrate. If the Legislature had wanted a more detailed definition of "significant," we believe they would have included it within the language of the statute.

While we do not conclude that there are grounds to overturn *Martin*, we acknowledge that magistrates and the MCAC should always remain cognizant that there can be more than one contributor or group of contributors affecting a mental disability "in a significant manner" and that the *Martin* test is only a guide to aid in the fact-finding process.

Affirmed.

/s/ Kathleen Jansen
/s/ Jane M. Beckering